**Sheriff Samuel FRANK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 2:94–CV–135.**

United States District Court,
D. Vermont.

Aug. 2, 1994.

---

Andrea L. Gallitano, Otterman & Allen, Barre, VT, for plaintiff.

Thomas D. Anderson, Asst. U.S. Atty. D. Vt., Burlington, VT and Michael Sitcov, U.S. Dept. of Justice Washington, DC, for defendant.

## FINDINGS OF FACT, OPINION AND ORDER

PARKER, Chief Judge.

This matter came before the Court on Plaintiff's Motions for a Temporary Restraining Order and/or Preliminary Injunction. The Court held a hearing on the Motion for a Preliminary Injunction on June 2, 1994. At that time the parties agreed to consolidate the hearing with a trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). After considering all testimony, affidavits and arguments submitted by the parties [1], the Court enters the following findings of fact, opinion, and order on the merits of this case.

### Findings of Fact

1. Sheriff Samuel Frank is the elected Sheriff of Orange County, Vermont, a jurisdiction of 992 square miles with a population of approximately 26,000 persons.

2. The Orange County Sheriff's Department consists of two full time law enforcement officers: Sheriff Frank and Deputy Dennis McClure.

3. The duties of the Sheriff are defined by 24 V.S.A. Chapter 5, subchapter 5.

---

1. The Court also considered the amicus curiae brief submitted by Handgun Control, Inc., Center to Prevent Handgun Violence, Major Cities Chiefs of Police, International Association of Chiefs of Police, National Association of Police Organizations, Fraternal Order of Police, Police Foundation, Federal Law Enforcement Officers Association, Police Executive Research Forum, National Troopers Coalition, and National Organization of Black Law Enforcement Executives. Further references to this brief will be designated "Amicus Brief, p. ___".

4. On a typical day, the Sheriff's office will have the Sheriff and one full time deputy on duty.

5. The Sheriff's Department provides court security in the county, transports state prisoners, transports some mental health patients, serves process and writs, investigates crime, and patrols the jurisdiction.

6. Funding for the Sheriff's Department comes from three sources: the State of Vermont, Orange County, and private security contracts.

7. The Vermont State Police respond to criminal activity in Orange County, enforce motor vehicle laws, and patrol the county. The Vermont State Police do not provide court security, prisoner transport, mental health transport, or service of process in Orange County.

8. On January 21, 1994 the Bureau of Alcohol, Tobacco, and Firearms (ATF) sent an "Open Letter to State and Local Law Enforcement Officials" on the topic of the so-called Brady Bill[2]. In this letter ATF discussed the definition of chief law enforcement officer ("CLEO"), which the Brady Bill defines as "the chief of police, the sheriff, or an equivalent officer or the designee of such individual," and stated its opinion that the definition of CLEO was broad enough, in some cases, to apply to more than one official in a given jurisdiction. The letter also expressed ATF's opinion that, in jurisdictions where more than one official satisfied the definition of CLEO, law enforcement officials could agree on having only one serve as CLEO.

9. On January 31, 1994 a meeting of all interested law enforcement agencies was held at Norwich University to discuss the implementation of the Brady Act in Vermont. At this meeting, representatives of local law enforcement agencies, the Vermont State Police, and the Bureau of Alcohol, Tobacco and Firearms (ATF) were present.

10. At the meeting, the obligations of CLEOs under the Brady Act was discussed.

11. Also at the meeting, James Walton, the Commissioner of Public Safety in Vermont, stated that the Vermont State Police was willing to function as the CLEO for Brady Act purposes, for any jurisdiction in which the sheriff or local police department declined to accept that responsibility.

12. Sheriff Frank stated his willingness to serve as CLEO for Orange County at the meeting, believing that the he was required to do so because he was the Sheriff or Orange County and thus directly implicated by the Act.

13. In his capacity as CLEO, Sheriff Frank received notices of proposed firearm transactions from federally licensed dealers, and either Sheriff Frank or his Deputy conducted some type of background check, ranging in time from 15 minutes to six hours, for each proposed transaction to attempt to determine whether it would violate the law.

14. Prior to the enactment of the Brady Act, Sheriff Frank would sometimes conduct criminal record checks in the normal course of his duties. The Sheriff's Department workload with respect to background checks approximately doubled after the Brady Act became effective.

15. On May 10, 1994 Sheriff Frank filed this case, seeking to have enforcement of the Brady Act enjoined and declared unconstitutional as violative of Article I, sec. 8, as well as the Fifth and Tenth Amendments of the Constitution.

16. Upon learning of the instant challenge to the Brady Act, Commissioner Walton wrote to Sheriff Frank and informed him he was requesting ATF to substitute Lt. George Contois of the Vermont State Police for Sheriff Frank as the CLEO for Orange County because Commissioner Walton believed that Sheriff Frank's conduct in challenging the Brady Act's constitutionality was evidence of his desire not to serve as CLEO.

17. After receiving Commissioner Walton's letter, Sheriff Frank has continued to perform background checks when he is notified of a proposed transfer by federal firearms dealers.

18. Sheriff Frank has not received notice from any party other than Commissioner

---

**2.** Further References will be to "ATF Open Letter."

Walton regarding his status as CLEO for Orange County.

### Conclusions of Law, Opinion and Order

To properly analyze Sheriff Frank's challenge to the Brady Act, it is necessary to review both the statutory framework of the Gun Control Act and the provisions of the Brady Act itself prior to any discussion of Sheriff Frank's complaint.

### I. Statutory Framework

The so-called Brady Act amends the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.,* which created a federal regulatory scheme governing the manufacture and distribution of firearms by private persons. One feature of the Gun Control Act is a requirement that a federal license be obtained to engage in the business of manufacturing, importing, or dealing in firearms in interstate or foreign commerce. 18 U.S.C. § 923(a). Licensees are required to maintain records of their transactions and to allow the Bureau of Alcohol, Tobacco, and Firearms to inspect the records. 18 U.S.C. § 923(g). Licensees are also prohibited from transferring firearms or ammunition to any person the licensee knows, or has reasonable cause to believe: is under indictment for, or has been convicted of a crime punishable by imprisonment for a term exceeding one year; is a fugitive from justice; is an unlawful user of certain illegal substances; has been adjudicated a mental defective; is an illegal alien; has been dishonorably discharged from the armed forces; or has renounced his or her U.S. citizenship. 18 U.S.C. § 922(d)(1)–(7).

Prior to the passage of the Brady Act, federal firearms dealers were required to have customers fill out ATF form 4473, on which the customer certified that he or she was not prohibited by law from receiving or possessing a firearm. 27 C.F.R. § 178.124. This self-certification was the only method by which a federal firearms dealer could determine whether or not a transfer was prohibited.

### II. The Brady Act

The interim provisions [3] of the Brady Act alter the prior scheme by imposing on the licensed dealers an obligation, under certain circumstances [4], to have the prospective transferee fill out an ATF Form 5000.35. 59 Fed.Reg. 7110, 7112, Feb 14, 1994. On this form the transferee must provide a statement that includes his or her name, date of birth, and address as they appear on a designated piece of picture identification. 18 U.S.C. § 922(s)(3)(A). The transferee must also state under oath that he or she is not barred from purchasing or receiving a firearm in interstate or foreign commerce. 18 U.S.C. § 922(s)(3)(B). The licensed dealer must then transmit the contents of the form to the Chief Law Enforcement Officer ("CLEO") of the place of residence of the prospective purchaser within one day of its completion and send a copy of the form to that official. 18 U.S.C. § 922(s)(1)(A)(i)(III)–(IV).

Upon receipt of the form, the Brady Act dictates that the CLEO "shall make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a handgun] would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General." 18 U.S.C. § 922(s)(2). The federally licensed dealer is prohibited from transferring the firearm until he or she is advised by the CLEO that the transfer would not be illegal, or until 5 days have elapsed since the CLEO received notice of the pro-

---

**3.** The challenged provisions of the law all relate to its interim provisions, which involve local law enforcement in the determination of whether a transfer of a firearm is prohibited. The Brady Amendment provides for the eventual use of a national instant background check system that licensed dealers can contact by phone or otherwise to determine whether a transfer is prohibited. 18 U.S.C. § 922(t)(1). The involvement of local law enforcement is contemplated under the

Amendment only until such time as the national system is operational, but not later than 1999. Pub.L. 103–159, Sec. 103(b). Thus it is the interim provisions and not the permanent provisions of the law that are challenged by Sheriff Frank.

**4.** No waiting period or background check is required under certain circumstances. *See* 18 U.S.C. § 922(s)(1)(B)–(F).

posed transfer, whichever occurs first. 18 U.S.C. § 922(s)(1)(A).

In the event that it is determined that the proposed transfer does not violate the law, the CLEO is also required to destroy any records received or generated due to the notice of proposed transfer within twenty days after the completion of the pre-transfer application. 18 U.S.C. § 922(s)(6)(B)(i). A purchaser who is determined ineligible to receive a handgun based on the CLEO's investigation may, upon request, obtain a written explanation from the CLEO explaining the reasons for denial. 18 U.S.C. § 922(s)(6)(C).

The Brady Act also contains a penalty provision, 18 U.S.C. § 924(a)(5), which states: "Whoever knowingly violates subsection (s) or (t) of section 922 shall be fined not more than $1,000, imprisoned for not more than 1 year, or both."

## III. The Complaint

Sheriff Frank's complaint seeks declaratory and injunctive relief concerning enforcement of the Brady Act. He contends that certain provisions of 18 U.S.C. § 922(s), specifically § 922(s)(2) (requiring CLEOs to make a reasonable effort to ascertain whether a proposed transfer would violate the law), § 922(s)(6)(B) (requiring CLEOs to destroy records relating to background checks), and § 922(s)(6)(C) (requiring CLEOs to provide written reasons to those who are determined ineligible for the transfer of a handgun) exceed Congressional authority under Article I, Section 8 of the Constitution and the Tenth Amendment. Sheriff Frank also interprets the penalty provision of the Brady Act, 18 U.S.C. § 924(a)(5) as providing for criminal penalties against local law enforcement authorities who do not comply with its provisions. In this regard, he raises a Fifth Amendment due process argument, claiming that the provisions of the Brady Act are unconstitutionally vague.

## IV. Discussion

### A. Can Sheriff Frank Challenge the Brady Act?

The Government asserts that the Court should not reach the merits of Sheriff

Frank's challenge to the Brady Act because he lacks standing. This argument takes two forms. First, the Government argues that Sheriff Frank is not the real party in interest and is not authorized to bring suit in his official capacity under Vermont law. Second, the Government argues that assuming he has the capacity to sue and is a real party in interest, Sheriff Frank lacks standing because he volunteered to be the CLEO for Orange County and has therefore suffered no injury traceable to the Brady Act.

### 1. Capacity and Real Party in Interest Status

■ The Government argues that "[u]nder Vermont law, plaintiff is a county officer, 24 V.S.A. § 290, but lacks authority to initiate this litigation in his official capacity. Instead, Vermont law expressly confers the authority to sue or be sued on counties themselves. *Id.* § 136." Thus the Government's position is that Sheriff Frank is really asserting the legal rights of Orange County, which he is not authorized to do. Fed.R.Civ.P. 17(a) and (b).

However, the matter is not as simple as the Government contends. The office of sheriff is created by Chapter II of the Vermont Constitution, sections 43, 50, and 53. Sheriffs are elected by the freemen of their districts under Chapter II § 50 of the Vermont Constitution, and the county as such has no part in the selection of a sheriff. Nor can the county remove a sheriff from office, which, aside from the election process, can be done only through an impeachment process before the Vermont State Legislature under Chapter II § 57 of the Vermont Constitution. The state, not the county, sets the salary of the sheriff. 32 V.S.A. § 1182.

Moreover, the duties of the sheriff are set by state statute, not by the county. The executive officers of the county are assistant judges, 24 V.S.A. § 131 *et seq.* who are given no authority to direct the sheriff's duties. Thus Sheriff Frank, though a statutory employee of the county, 24 V.S.A. § 290, functions independently of the county in many important respects. Viewed in this light, it is unclear that the county would be the real

party at interest in this case. The Brady Act asks nothing of the county *qua* county. To the extent that Brady directs Sheriff Frank to undertake duties other than those that he would do in the absence of Brady, the county, which has no control over the sheriff's duties in the first place, does not suffer any injury. Given this situation, the Government's argument that 24 V.S.A. § 136, which states that "[a]ctions *in which a county is the party in interest* shall be brought by or against the county ..." (emphasis added) deprives Sheriff Frank of capacity to sue is misplaced. It is the sheriff, not the county, who is directed to take action by the Brady Act and who must attempt to reconcile these actions with his Vermont statutory mandates and oath of office. The county faces no similar dilemma.

Whether or not the county could have brought this action, it is clear to the Court that, subject to the standing considerations that will be discussed below, Sheriff Frank must have capacity to initiate this challenge. As noted by the Court in *McGee v. United States of America*, slip op., civ. action no. 2:94cv67Ps, p. 5, (S.D.Miss., June 2, 1994), a similar challenge to the Brady Act:

> It would be anomalous indeed if Congress can direct a sheriff to take specific action; if Congress may provide that a sheriff may be sued in civil rights actions; and if sheriffs can be sued for deprivation of constitutional rights by inmates; but a sheriff cannot bring a suit to declare unconstitutional an action of Congress that directly impacts upon such sheriff, and impacts upon no other state, county or federal official.

A determination that Sheriff Frank has capacity to bring the action as Sheriff does not end the inquiry. The Government's contention that Sheriff Frank lacks standing because he has suffered no injury traceable to the Brady Act must also be addressed.

**2. Standing**

■ The Government claims that Sheriff Frank lacks standing because he has not demonstrated that he has suffered, or is in imminent danger of suffering, a distinct and palpable "personal injury fairly traceable to the defendant's allegedly unlawful conduct

and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). This argument stems from the fundamental principle that federal court jurisdiction is limited by Article III to cases and controversies. As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) "... the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."

In *Lujan*, the Supreme Court discussed the requirements of standing. *Id.* —— U.S. at —— – ——, 112 S.Ct. at 2135–37. It found that "the irreducible constitutional minimum of standing contains three elements." *Id.* —— U.S. at ——, 112 S.Ct. at 2136. The three elements that must be shown are: (1) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized, actual or imminent and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.*

**a. Injury in Fact**

Sheriff Frank's claimed injury is that, by functioning as CLEO, he has used some portion of his department's finite resources completing tasks that are not part of his Vermont statutory duties. In this case, Sheriff Frank testified and the Court found that each background check he does on a prospective gun purchaser takes a minimum of fifteen minutes and sometimes up to six hours. Moreover, Sheriff Frank argues that the Brady Act forces him to expend funds and resources in a manner inconsistent with the scope of his duties as outlined in 24 V.S.A. ch. 5, subch. 5 and thus compliance with Brady "places him at risk of violating his oath of office, impeachment, and diminished re-election potential." Plaintiff's Second Memorandum in Response, p. 11. Sheriff Frank also fears that he either faces criminal prosecution pursuant to 18 U.S.C. § 924 or the appearance to his constituents that he is

not law abiding if he does not comply with Brady.

The Government interprets Brady as requiring merely an exercise of discretion on the part of Sheriff Frank and argues that this "mandatory" discretionary duty is consistent with Constitutional requirements. As for Sheriff Frank's fear of criminal prosecution, the Government has interpreted 18 U.S.C. 924(a)(5) as not providing criminal penalties for CLEOs. *See* Memorandum for Janet Reno, Attorney General from Walter Dellinger, Office of Legal Counsel, March 16, 1994.

■ With regard to Sheriff Frank's Fifth Amendment claim, I agree that he has not shown injury because he has not been prosecuted under the statute nor is he in any imminent danger of being prosecuted because the Office of Legal Counsel for the Department of Justice has taken the position that Brady's criminal penalty provisions do not apply to CLEOs acting in their official capacity. *See id.* Therefore, he lacks standing to challenge the statute on vagueness grounds because he will not be subject to criminal penalties whether or not he complies with Brady.[5]

The Government's responses to Sheriff Frank's claim of injury with regard to his Tenth Amendment claim, however, do not directly refute Sheriff's Frank's claim of on-going injury. Rather, they actually go to the question of whether or not it is Brady or Sheriff Frank himself that has inflicted the injury. Accordingly, these arguments will be addressed below.

b. Causation

The heart of the Government's standing argument is that Sheriff Frank volunteered to be the CLEO for Orange County when he was under no obligation to do so. As such, the Government maintains, any injuries he has suffered are entirely self-inflicted, cannot be traced to the defendant's conduct, and therefore cannot provide him with standing

to challenge the constitutionality of the Brady Act. *See Petro–Chem Processing Inc. v. EPA,* 866 F.2d 433, 438 (D.C.Cir.), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) (self-inflicted injuries cannot form the basis for standing to challenge statute).

Prior to an evaluation of the Government's position, a more detailed discussion of both the statute and the facts surrounding Sheriff Frank's designation and removal as the CLEO for Orange County is necessary.

As discussed above one feature of the Brady Act is its requirement that federal licensees have prospective handgun purchasers complete an ATF form and that licensees notify the "chief law enforcement officer of the place of residence of the" purchaser of the contents of the form. 18 U.S.C. § 922(s)(1)(A)(III). The CLEO is then subject to the provisions of Brady that Sheriff Frank has challenged here. The Brady Act defines CLEO ("chief law enforcement officer") as "the chief of police, the sheriff, or an equivalent officer or the designee of any such individual." 18 U.S.C. § 922(s)(8).

While Sheriff Frank is plainly within the definition of CLEO, the Government's position, as explained in an ATF Open Letter to State and Local Law Enforcement Officials, is that the definition is "broad enough, in some cases, to give the [firearms dealer] more than one official to contact" and that "the law will clearly permit law enforcement officials to agree that, within a given jurisdiction, one agency will serve the role as CLEO." ATF Open Letter, p. 8

On January 31, 1994, the Commissioner of the Vermont State Police and the senior ATF agent for Vermont held a meeting for all interested law enforcement officers to discuss Brady. At that meeting Commissioner Walton took the position that designation as CLEO for Brady purposes was voluntary, and that the state police would serve as CLEO in any jurisdiction in which the elect-

---

**5.** The Court notes its agreement with the Office of Legal Counsel Opinion that "the absence of a definitive standard inherent in the term "a reasonable effort" would very likely pose an insurmountable hurdle to successful prosecution or raise a substantial due process question" if the Government were ever to reverse field and try to prosecute a CLEO for failing to perform his or her duties as required by the Brady Amendment.

ed law enforcement official did not want to undertake the CLEO's responsibility. At the meeting Sheriff Frank indicated that he would serve as the CLEO for Orange County.

After this case was filed Commissioner Walton sent Sheriff Frank a letter in which he expressed his concern that the Sheriff had chosen to attack the Brady Act's constitutionality. Commissioner Walton also stated that he was requesting that ATF delete Sheriff Frank from its list of CLEOs and substitute Lieutenant G.C. Contois of the Vermont State Police as the CLEO for Orange County.

Thus the Government argues that Sheriff Frank does not have, and never has had, standing because he never had to undertake the role of CLEO, but could have let Commissioner Walton designate the Vermont State Police as CLEO for Orange County.

■ Sheriff Frank takes issue with the Government's conclusion that the Vermont State Police is an "equivalent officer" for the purposes of the definition of chief law enforcement officer. Although the Vermont State Police are given powers equivalent to those of sheriffs by 20 V.S.A. § 1914, Sheriff Frank takes the position that the intent of Brady was that *local* law enforcement, not the state police, were intended to perform the Brady background checks and therefore the Vermont State Police are not "equivalent officers" and can not relieve him of his Brady obligations. Sheriff Frank essentially argues that Commissioner Walton's "offer" to have the Vermont State Police serve as CLEO was ineffectual because the Vermont State Police do not fit the statutory definition of CLEO.

The Government argues that although "equivalent officer" is nowhere defined in the statute, "that term must, at a minimum, include any official whose powers are the same

as a 'sheriff' or a 'chief of police.'" Defendant's Opposition To Plaintiff's Motion for a Preliminary Injunction, at 20. Furthermore, the Government urges that ATF's interpretation of the statute be should given substantial weight. *Chevron v. Natural Res. Def. Council,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

However, ATF's construction is entitled to substantial weight only where the intent of Congress is unclear.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Id.* at 842, 104 S.Ct. at 2781. In this instance the Court finds that the statute clearly contemplates that background checks will be done by local, and not state, law enforcement officials and that ATF's interpretation is contrary to the intent of Congress [6].

The first clue that Congress did not intend for state law enforcement officials to be serving as CLEO's is that the definition of CLEO does not include any reference to them. This fact is particularly significant when the CLEO definition is compared to the Brady Act's provisions relating to the reporting of multiple firearms sales. These provisions require federal licensees to prepare reports of multiple handgun sales and forward them to *"the department of state police or state law enforcement agency of the state* or local law enforcement agency of the local jurisdiction in which the sale or other disposition took place ..."* 18 U.S.C. § 923(g)(3)(A) (Emphasis added). The amendments also provide that "... *the department of state police or state law enforcement agency of the state* or

---

**6.** The only issue that needs be addressed here is whether the state police in Vermont are "equivalent" to a sheriff or a chief of police. There is no need to reach the question of whether the language of the Brady Act's CLEO definition allows for more than one CLEO in a given jurisdiction, although it seems that the term "equivalent officer" could easily be read to mean the chief local

law enforcement officer of the jurisdiction in the event that a given jurisdiction does not employ the term "chief of police" or "sheriff."

However, the Court will assume that more than one CLEO may exist in a given jurisdiction and limit the inquiry to the question of whether the Vermont State Police are "an equivalent officer" to the Sheriff of Orange County.

local law enforcement agency of the local jurisdiction shall not disclose any such form or the contents thereof to any person or entity, and shall destroy each such form ..." 18 U.S.C. § 923(g)(3)(B) (Emphasis added). These provisions strongly indicate that where Congress intended to impose duties that could be fulfilled by either state or local law enforcement officials, it did so explicitly.

The legislative history of the Brady Act confirms this interpretation. The House Report "Summary and Purpose" section describes the bill as follows: "*Local* law enforcement officials are required to use the waiting period to determine whether a prospective handgun purchaser has a felony conviction or is otherwise prohibited by law from buying a gun." H.R.Rep. No. 344, 103d Cong. 1st. Sess. p. 7 (1993) *reprinted in* 1993 U.S.C.C.A.N.1984. (Emphasis added.) In the section "Brief Explanation of H.R. 1025," under the heading "the waiting period" the intent of the Congress is again revealed: "... the transferor would be required to notify *local* law enforcement officials of the proposed sale.... The bill requires *local* law enforcement officials to make a reasonable effort ..." *Id.* at 10, 1993 U.S.C.C.A.N. 1987.

Prior to the initiation of this case, ATF itself apparently felt that the background checks were to be conducted by local law enforcement, stating in its open letter:

> ... the law is designed so that the law enforcement authority who is doing the check, is the one who is most likely to have to deal with the consequences of the buyer obtaining a handgun. Therefore, the CLEO of the buyer's residence has a vested interest in conducting an appropriate

check and ultimately is in the best position to determine what is reasonable.

ATF Open Letter, p. 10.

Even in the absence of the foregoing evidence of Congressional intent regarding state police generally serving as CLEOs, there are practical reasons why the Vermont State Police cannot be considered the "equivalent" of Sheriff Frank even if their legal authority is the same under state law. Attorney General Reno, in urging one of the Brady Bill's chief sponsors to reject proposed amendments to the Brady Bill that would establish a date certain for establishment of a federal instant check system, wrote:

> Background checks performed by local police remain the most effective means of screening out ineligible gun buyers. It is local law enforcement who best know the residents and residencies within their communities. Local law enforcement can check to see if a given purchaser resides at the given address, and can access local, county, state, and national records— whether they are in file folders or computerized.

Letter from Attorney General Reno to Rep. Charles Schumer (Nov. 9, 1993) (Ex. 1 attached to Amicus Brief).

The reasons given by Attorney General Reno in support of having local law enforcement perform background checks demonstrate why state and local officials may not be equivalent even if they are given the same powers under state law.[7] Sheriff Frank testified and the Court found that his department transports prisoners and mental health patients in the county, provides court security in the county, and maintains local records, many of which are not computerized. All of these activities put the Sheriff in a unique

---

7. The Government's syllogism in support of their position that the state police are "equivalent officers" to the sheriff runs as follows: (1) the sheriff's powers are defined by statute; (2) the state police have "the same powers with respect to criminal matters and the enforcement of the law relating thereto as sheriffs ..." 20 V.S.A. § 1914; (3) therefore the state police are an "equivalent officer" under he Brady definition of the CLEO. This argument fails to acknowledge that entities with the same powers under state law are not necessarily equivalent.

As an example, the Court notes that under Vermont law, a sheriff who has completed certain training requirements may exercise his or her powers, "with respect to criminal matters and the enforcement of law", on a statewide basis. 24 V.S.A. § 312. If one were to adopt the Government's expansive interpretation of "equivalent officer", not only the state police, but also the sheriff of any other county in the state, could serve as the CLEO for Orange County because, in a jurisdictional sense, they would have the same powers with respect to criminal matters in Orange County as Sheriff Frank.

position in terms of his familiarity with the local citizenry of Orange County. The state police, while given equivalent legal authority in the county, do not perform any of these functions on a regular basis. It is clear that Congress sought to take advantage of the local law enforcement's familiarity with the population when the background check provision was drafted. For this reason, the Court finds that the Vermont State Police cannot be considered the CLEO for Orange County because they are not an "equivalent" to Sheriff Frank.

Even if the state police could fulfill the role of CLEO for Orange County, it is not clear to the Court that Sheriff Frank has ever been removed as CLEO or that any federal agency has informed Sheriff Frank that he does not have any obligations under the Brady Act. The only proof offered on this point by the Government is a letter from Commissioner Walton of the Vermont State Police to Sheriff Frank, which states that Commissioner Walton will request that ATF remove Frank's name from its list of CLEOs.[8] Notably, the Government's brief is completely bereft of reference to any authority that gives the State of Vermont the power to relieve Sheriff Frank of an obligation imposed under federal law.[9] Sheriff Frank has understandably continued processing background checks under the assumption that the he is still the CLEO because he has never received notice to the contrary from any federal agency. Accordingly, to at least some extent, Sheriff Frank is still functioning as the CLEO.

In sum, Sheriff Frank is in the following position. A federal law imposes certain arguably unconstitutional obligations on chiefs of police, sheriffs, or equivalent officers. As a Sheriff, Frank reasonably believes he must comply with the law and has done so, but has challenged the constitutionality of the law. A third party, the State of Vermont, claims to be an equivalent officer and has told Sheriff Frank that it will assume his federal obligations because his challenge to the law makes it clear that he no longer wishes to comply with it. Sheriff Frank does not agree that the third party is legally his equivalent, nor does he believe that the third party, which is not a federal agency, can excuse him from performance of his duties. He therefore seeks a Court order declaring the law unconstitutional but has continued to perform the functions required under the law because no party with the authority to relieve him of his federal obligations has done so.

▪ For all of the above reasons, the Court finds that Sheriff Frank's injuries are directly traceable to the Brady Act and that Commissioner Walton's offer to serve as CLEO did not deprive Sheriff Frank of standing because: (1) the state police in Vermont are not "equivalent officers" under 18 U.S.C. § 922(s)(8) and cannot serve as CLEOs; (2) Sheriff Frank has never been removed as CLEO by a party with authority to remove him; and (3) the state police never had the power to relieve the Sheriff of his obligations under the Brady Act in the first place.[10]

---

8. The Government asserts in its brief that ATF has removed Sheriff Frank from the CLEO position and substituted the Vermont State Police. However, the Government left the citation to the Federal Register blank. The Court has conducted several database searches in an attempt to find any reference in the Federal Register to a change in the CLEO for Orange County but has been unable to do so.

9. The Government's brief mentions that "the State Police would designate itself as the CLEO for any jurisdiction where local law enforcement officials who also satisfied the CLEO definition did not want to perform the CLEO's duties.... [P]laintiff volunteered to assume the CLEO's duties for Orange county, and was designated as such by the Commissioner." Gov. brief at 21. Implicit in the Government's description is the

assumption that the Commissioner of the State Police, as opposed to ATF or a local official, has the power to "designate" itself or someone else as the CLEO for any jurisdiction in Vermont. Given that the state police are not mentioned in the definition of CLEO, it would seem odd that the statute delegates to the state police the power to "designate" Sheriff Frank as the CLEO for Orange County, or to "designate" itself CLEO if Sheriff Frank challenges the constitutionality of the statute.

10. The Court notes that while the imposition of federal mandates on local law enforcement officials and the subsequent agreement of a state entity to voluntarily assume the federal responsibilities of the local official has created somewhat unique standing questions, the result is generally

### c. Redressability

It is clear that a decision by this Court in favor of Sheriff Frank will redress his injuries in that he will no longer have to perform background checks at all if enforcement of the Brady Act is enjoined. Because Sheriff Frank has shown injury in fact, causation, and redressability, he has standing to bring his claim, the merits of which will now be addressed.

## B. The Tenth Amendment Challenge [11]

Sheriff Frank's Tenth Amendment challenge to the Brady Act is relatively straightforward. He relies on *New York v. United States*, —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) to support his contention that a federal statute may not direct him, a local official, to perform background checks or otherwise implement a federal program. Although the Government vigorously disputes Sheriff Frank's Tenth Amendment analysis, it also disputes that the Brady Act requires any action on his part. Rather, the Government reasons, Brady merely requires him to "consider" whether or not to perform a background check in any given case. Accordingly the Court must first determine what the Brady Act requires of Sheriff Frank prior to determining whether such requirements are constitutional.

### 1. Section 922(s)(2)

■ Section 922(s)(2) provides:

A chief law enforcement officer to whom a transferor has provided notice shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and a national system designated by the Attorney General.

Sheriff Frank reads this provision as requiring that some sort of background check be performed by him. The Government, however, reads the "reasonable effort" provision expansively, concluding that a "reasonable" effort may be no effort at all. The ATF Open letter states, for example, that "[i]n rural, sparsely populated counties where many handguns purchasers are personally known to the CLEO, little or no research may be necessary in many cases." ATF Open letter, page 10 [12].

Once again, however, the Government's interpretation of the statute is clearly contrary to the intent of Congress. To begin, the statute states that CLEOs "shall" make a reasonable effort to determine whether a transfer is prohibited. Moreover, the Congress specifically rejected an amendment that would have changed "shall" to "may". H.R.Rep. 344, 103d. Cong., 1st. Sess, p. 39 (1993) *reprinted in* 1993 U.S.C.C.A.N.1984, 2009. It is hard to imagine a clearer indication of Congressional intent that a provision be mandatory rather than discretionary.

---

consistent with the Supreme Court's observation in *Lujan* that:

> When the suit is one challenging the legality of government action ... the nature and extent of facts that must be proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgement preventing or requiring the action will redress it.
> —— U.S. at ——, 112 S.Ct. at 2137.

**11.** Sheriff Frank's contention that the Brady Act is beyond the scope of Article I, sec. 8 is subsumed within the Tenth Amendment analysis and will not be addressed separately. The Tenth Amendment only applies to powers "... not delegated to the United States...." Therefore, any

Tenth Amendment argument is a *de facto* argument that the power in question was not delegated to the United States in another provision of the Constitution.

**12.** The Government places great weight on this statement as articulating the position of ATF with regard to the definition of reasonable effort. However, the ATF Open letter is less than consistent in its discussion of "reasonable effort." In addition to the portions of the letter quoted by the Government, the Open letter also states that "the law clearly anticipates some minimal effort to check commonly available records." (p. 9). In any event the fact that there may be some instances in rural counties when a handgun purchaser is personally known to the CLEO, making research unnecessary, does nothing to undercut the mandatory nature of the statute in all other cases.

Perhaps the most important phrase overlooked by the Government is *"including* research in whatever State and local record-keeping systems are available and a national system designated by the Attorney General." The use of the word "including" indicates that a reasonable effort will include, at a minimum, research in the national system designated by the Attorney General and research in "whatever" State and local systems are available.

Thus the CLEO "shall" make a "reasonable effort" to ascertain whether a transaction is prohibited, "including" some designated research. These terms cannot be reconciled with the Government's contention that Sheriff Frank is not required to perform some type of background check when he receives notice of a proposed transfer (except, perhaps, in those instances when he might already have in mind all the necessary information).

The legislative history also reflects the mandatory nature of the background check. The Summary and Purpose section of the House report states:

> Local law enforcement officials are *required* to use the waiting period to determine whether the prospective purchaser has a felony conviction or is otherwise prohibited by law from buying a gun.

*Id.* at 7, 1993 U.S.C.C.A.N.1984 (emphasis added).

Furthermore, the "Brief Explanation" of the bill contained in the House report states:

> The bill *requires* local law enforcement officials to make a reasonable effort to ascertain whether the prospective purchaser is forbidden from buying a handgun. This background check *must* be conducted within five business days from the date on which the prospective purchaser first indicated his or her intention to purchase a handgun.

*Id.* at 10, 1993 U.S.C.C.A.N.1987 (emphasis added).

The Court concludes that the Brady Act places a duty on Sheriff Frank to perform

some type of background check. The question then becomes whether such a requirement is consistent with the Tenth Amendment.

**2.  New York v. United States**

■  *New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120, is the most recent Supreme Court case discussing the Tenth Amendment and the ability of the Congress to require states to regulate or to administer federal programs.[13]  The issue in *New York* was the constitutionality of the Low Level Radioactive Waste Policy Act. The Act contained a "take title" provision that gave each state two options for dealing with certain kinds of radioactive waste within its borders. *Id.* —— U.S. at ——, 112 S.Ct. at 2416.  The states could either enact legislation consistent with Congressional directives or "take title" to the waste within its borders and face liability for all damages caused by the waste. *Id.*

The Court found that because Congress did not have the authority to impose either option as a freestanding requirement, neither did it have the authority to offer a choice between the two. *Id.* —— U.S. at ——, 112 S.Ct. at 2428. Justice O'Connor, writing for the majority, was careful to point out that there are many permissible ways for Congress to encourage a State to regulate in a particular way. For example, Congress may attach conditions on the receipt of federal funds, *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (Congress may condition receipt of highway funds on the adoption of a minimum drinking age) or may, when operating pursuant to the Commerce Clause, offer States the choice of regulating a given area according to federal standards or having state law pre-empted by federal regulation. *Hodel v. Virginia Surface Mining & Reclamation Assn, Inc.* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (upholding Surface Mining Control and Reclamation Act of 1977 because states were not compelled to enact federal program but could choose not to participate the federal pro-

---

**13.**  The Government bemoans the fact that "for all practical purposes" Sheriff Frank relies exclusively on *New York.*  That observation is correct.

Of course, if a party is going to rely exclusively on one case, the most recent Supreme Court case discussing the issue at hand is not a bad choice.

gram, in which case regulation would fall to the Federal Government). Justice O'Connor explained why such "encouragement" from the Federal Government is permissible:

> By either of these two methods, as by any other permissible method of encouraging a State to conform to federal policy choices, the residents of the state retain the ultimate decision as to whether or not the State will comply. If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant. If state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the cost of a federally mandated regulatory program, and they may continue to supplement that program to the extent state law is not preempted. Where Congress encourages state regulation rather than compelling it, state governments remain responsible to the local electorate's preferences; state officials remain accountable to the people.

*Id.* — U.S. at ——, 112 S.Ct. at 2428.

In contrast, the take title provision in *New York* required the states to comply with one of two options, both dictated by the Federal Government, and was therefore invalidated. The Court explained:

> The take title provision appears to be unique. No other federal statute has been cited which offers a state government no option other than that of implementing legislation enacted by Congress. Whether one views the take title provision as lying outside of Congress' enumerated powers, or as infringing upon the core of state sovereignty reserved by the Tenth Amendment, the provision is inconsistent with the federal structure of Government established by the Constitution.

*Id.* — U.S. at ——, 112 S.Ct. at 2429.

*New York* controls the outcome of this case. Like the take title provision in *New York,* the background check provision of the Brady Act has provided no option to local officials but has merely directed them to administer the federal program. Whether a Vermont Sheriff is to be compelled to undertake the duty of conducting background checks is a decision that the Vermont Legislature, not the United States Congress, must make. This is so because the Vermont Legislature, not the United States Congress, is the only legislative body that can determine how these duties affect all other duties a sheriff is required to perform. It is the Vermont legislature that determines the Sheriff's salary and determines his or her duties. This enactment improperly commands action on the part of a local law enforcement official. There can be no doubt that such a command is unconstitutional.

> ... one thing is clear: the Federal Government may not compel the states to enact or administer a federal statutory program.

*Id.* — U.S. at ——, 112 S.Ct. at 2435.

The Government's attempts to distinguish *New York* are unavailing. Moreover, many of its arguments were flatly rejected by the Court in *New York.* For example, the Government contends at one point that: "*New York* did not suggest that the federal government can never mandate that state governments assist in the enforcement of federal statutes." Defendant's Opposition To Plaintiff's Motion for a Preliminary Injunction, at 30. On the contrary, *New York* appears to suggest just that:

> ... the United States argues that the Constitution does, in some circumstances, permit federal directives to state governments. Various cases are cited to support this proposition, but none support it.

*Id.* — U.S. at ——, 112 S.Ct. at 2429.

Of particular note is the Government's contention that *New York* is distinguishable because the statute at issue there was directed at states and completely dominated state legislative and regulatory processes. In essence, by making this argument the Government concedes that Congress could not compel the states to pass legislation requiring all local law enforcement officials to conduct background checks. What is remarkable is the Government's apparent contention that Congress is somehow on *better* constitutional footing if it by-passes the state legislature

altogether and directly compels state and local officials acting in their official capacity to undertake federally mandated duties. Of course, if this were the case, Congress would never have to encourage states to adopt legislation because it could simply "eliminate the middle man" and pass federal legislation requiring state officials to carry out the desired federal programs.

Other arguments advanced by the Government can be easily dismissed. As in *New York,* references to Tenth Amendment cases that discuss the authority of Congress to subject state governments to generally applicable laws, *e.g., Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), are inapposite because the Brady background check provisions are not generally applicable, but are directed solely at local law enforcement officials. *See New York,* —— U.S. at ——, 112 S.Ct. at 2420.

Nor is this a case addressing the ability of Congress to pass laws enforceable in state courts. *E.g., Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Such cases merely involve application of the Supremacy Clause and are not concerned with the Federal Government's ability to compel non-judicial officers to implement federal programs. Although *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), held that a state *administrative* body, the Mississippi Public Service Commission, could be compelled to adjudicate disputes arising under a federal statute, it is within this class of cases because the Court found that the administrative body was part of the "state adjudicatory machinery" and that the case was therefore controlled by *Testa v. Katt. Id.* 456 U.S. at 760, 761, 102 S.Ct. at 2137–38, 2138.[14] Accordingly, neither *Testa v. Katt* nor *FERC* provide any support for the proposition that the Federal Government may command that non-adjudicatory state officials to carry out federal directives.

Finally, the Government (and amici) also discuss at length the pressing need for federal legislation such as the Brady Act. I do not question the sincerity of those who have worked for passage of the Brady Act, nor do I at all dispute the fact that the Federal Government may regulate the transfer of firearms.[15] However, laudable ends cannot be used to justify unconstitutional means. Justice O'Connor addressed this very question in *New York.* Her words are equally applicable here:

> Some truths are so basic that, like the air around us, they are easily overlooked. Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "formalistic" to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day. [The issue before the Court] is a pressing national problem, but a judiciary that licensed extra-constitutional government with each issue of comparable gravity would, in the long run, be far worse.

*New York,* —— U.S. at ——, 112 S.Ct. at 2434.

Believing as I do, that the Tenth Amendment of the United States Constitution prohibits the United States Congress from usurping the power of the Vermont State Legislature by requiring local law enforcement to administer this federal program, I conclude that 18 U.S.C. § 922(s)(2) is unconstitutional.

---

**14.** The Court noted that any other decision would allow the States to disregard the preeminent position held by federal law. *FERC,* 456 U.S. at 761, 102 S.Ct. at 2138. No such concerns are present here, where no "state adjudicatory machinery" is involved.

**15.** Although the subject of federal law challenged here is the transfer of handguns, this case has absolutely nothing to do with the Second Amendment or the right to bear arms. This case is about the ability of the Federal Government to require action on the part of local officials.

2. 18 U.S.C. § 922(s)(6)(B) and 922(s)(6)(C)

Because § 922(s)(2), which requires that CLEOs conduct a background check has been invalidated, § 922(s)(6)(B) (which directs CLEOs to destroy records received or generated as a result of a background check if the transfer is allowed) and § 922(s)(6)(C) (which directs the CLEO to provide a written explanation to a party whose proposed transfer is denied) are no longer mandatory provisions. These provisions will only apply to those CLEOs who choose to cooperate with § 922(s)(2). No CLEO is compelled to comply with these provision because he or she can choose not to participate in background checks at all. Therefore, these provisions are not invalid once the mandatory nature of § 922(s)(2) is eliminated.

C. Severability

■ In *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987) the Supreme Court established that "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operable as law." *Id.* at 684, 107 S.Ct. at 1480. Moreover, when Congress adopts a severability clause there is a presumption that the unconstitutional part of act is severable. *Id.* at 686, 107 S.Ct. at 1481. The Gun Control Act, which the Brady Bill amended, contains a severability clause. 18 U.S.C. § 928.

It is not evident to the Court that this presumption of severability has been overcome by the Plaintiff. Sheriff Frank baldly asserts that the Act would "serve no purpose" without mandatory background checks, but he provides no support for that proposition. Moreover, Sheriff Frank labors under the assumption that without a mandatory provision, no background checks will be done at all. However, to the extent that other Sheriffs or Chiefs of Police elect to cooperate with federal officials in administering the Brady Act, the Act will function as Congress intended. Without the mandatory background check, the Act can operate as intend-

ed by Congress with the exception that local law enforcement would then have the option, rather than the obligation, of conducting a background check during the five-day waiting period.[16] Because the Act is still "fully operable as law" without a mandatory background check provision, the balance of the Brady Act remains fully operational.

CONCLUSION

The Court concludes that 18 U.S.C. § 922(s)(2) is an unconstitutional mandate from Congress which violates the Tenth Amendment of the United States Constitution. The Court hereby ORDERS that judgement shall enter declaring section 922(s)(2) of Title 18 unconstitutional and void and permanently enjoins the United States from enforcing that provision in the District of Vermont. The remainder of the Brady Act remains unaffected by the judgement or by this ORDER.

---

**16.** There can be no doubt that at least some CLEOs will find it in their own best interest to conduct background checks.