Samuel FRANK, Plaintiff–Appellee–
Cross–Appellant,

v.

UNITED STATES of America,
Defendant–Appellant–
Cross–Appellee.

Nos. 138, 506, Dockets 95–6019, 95–6023.

United States Court of Appeals,
Second Circuit.

Argued Aug. 28, 1995.

Decided March 14, 1996.

Mark B. Stern, Washington, D.C. (Sean A. Lev, Stephanie R. Marcus, Appellate Staff, Civil Division, Department of Justice, Washington, D.C.; Frank W. Hunger, Assistant Attorney General, Walter Dellinger, Assistant Attorney General, Richard L. Shiffrin, Deputy Assistant Attorney General, H. Jefferson Powell, Stuart M. Benjamin, Office of Legal Counsel, Washington, D.C.; Charles R. Tetzlaff, United States Attorney, Civil Division, Burlington, Vermont, of counsel and on the brief), for Appellant United States of America.

Andrea L. Gallitano, Barre, Vermont (David A. Otterman, Otterman and Allen, Barre, Vermont, of counsel), for Appellee Samuel Frank.

Randolph D. Moss, Washington, D.C. (Anthony G. Brown, James S. Campbell, Wilmer, Cutler & Pickering, Washington, D.C.; Dennis A. Henigan, Gail A. Robinson, Center to Prevent Handgun Violence, Legal Action Project, Washington, D.C., of counsel), filed a brief on behalf of Handgun Control, Inc., Center to Prevent Handgun Violence, International Association of Chiefs of Police, Major Cities Chiefs, National Organization of Black Law Enforcement Executives, Fraternal Order of Police, National Association of Police Organizations, National Troopers' Coalition, Police Executive Research Forum, and Federal Law Enforcement Officers' Association as Amici Curiae.

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CARDAMONE, Circuit Judge:

The United States appeals from a judgment entered August 2, 1994 in the United States District Court for the District of Vermont (Parker, C.J.) declaring unconstitutional that section of the Brady Handgun Violence Prevention Act of 1993 (Brady Act or Act) which requires background checks of potential handgun buyers, Pub.L. No. 103–159, § 102(a)(1), 107 Stat. 1536, 1537–38 (1993) (codified at 18 U.S.C. § 922(s)(2) (1994)). Plaintiff Samuel Frank, the Sheriff of Orange County, Vermont, cross-appeals from the district court's rulings that he lacked standing to challenge the Brady Act on Fifth Amendment grounds and that the background check provision is severable from the remainder of the Act.

Sheriff Frank does not argue that Congress lacks the power to regulate transactions involving handguns. Apart from federalism concerns, the commerce power of the United States is almost certainly broad enough to support such regulation. *See United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995) ("[T]he proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce."); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 252, 258, 85 S.Ct. 348, 354–55, 358, 13 L.Ed.2d 258 (1964) (although final version of Civil Rights Act carried no congressional findings, burden on interstate commerce permitted prohibition of racial discrimination by motels); H.R.Rep. No. 90–1577, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411 ("The principal purpose of [the Gun Control Act] is to strengthen Federal controls over interstate and foreign commerce in firearms...."); H.R.Rep. No. 103–344, 103d Cong., 1st Sess. 9–10 (1993), *reprinted in* 1993 U.S.C.C.A.N.1984, 1986–87 (background checks intended to effectuate prohibitions contained in Gun Control Act).

The issue on this appeal, then, does not involve Congress' ordinary power to regulate

under the Commerce Clause; the issue is whether the regulatory means chosen under the Brady Act are valid or intrude impermissibly upon state sovereignty. At the front where the enumerated powers granted to Congress under the Constitution clash with those powers reserved to the States by the Tenth Amendment, there is no certain line of demarcation. But whatever line there is, it is one to which we should hold strongly. The powers reserved to the States must not be, like the Maginot line, easily outflanked by the powers of the national government. In our view, the background check provisions of the Brady Act do not cross that line and trespass on those rights reserved by the Tenth Amendment.

## FACTS

### A. *The Brady Act*

Congress enacted the Brady Act in 1993 to address the national epidemic of handgun violence and death. *See* H.R.Rep. No. 103–344, 103d Cong., 1st Sess. 8 (1993), *reprinted in* 1993 U.S.C.C.A.N.1984, 1985. The Act amends title I of the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921–930 (1994)), which regulates firearms dealers and prohibits the transfer of firearms to specific categories of persons ranging from felons and "fugitive[s] from justice" to certain noncitizens. *See* 18 U.S.C. § 922(g). To put teeth into these prohibitions by identifying unlawful gun transactions before they occur, the Act imposes a background check system.

The Act operates in two phases. First, it requires the U.S. Department of Justice to develop a national instant background check system for firearms transfers, which is to be operational by the year 1999. *See* § 103(b), 107 Stat. at 1541; 18 U.S.C. § 922(t) (permanent provision). This instant check system requires no waiting period. *See* § 922(t)(1). Second, for gun purchases occurring before the national system is active, the Act contains an interim provision that imposes a five-day waiting period during which a background check is to take place. § 922(s)(2). This provision does not apply in States that require pre-purchase background checks, *see* § 922(s)(1)(D), or permits and pre-permit

background checks for handgun purchases, *see* § 922(s)(1)(C).

It is this interim background check provision that is the subject of the instant litigation. Such checks are to be conducted by the "chief law enforcement officer" (CLEO) of the proposed purchaser's place of residence, *see* § 922(s)(2), which the Act defines as "the chief of police, the sheriff, or an equivalent officer or the designee of any such individual." § 922(s)(8). Before transferring a handgun, a licensed firearms dealer must obtain a statement from the purchaser (transferee). § 922(s)(1)(A)(i)(I). In practice, this means that a person seeking to buy a handgun must fill out a form prepared by the Bureau of Alcohol, Tobacco and Firearms (Bureau). *See* 27 C.F.R. § 178.102(a)(1) (1995) (conditioning handgun transfers on receipt by the licensee of a "statement of intent to obtain a handgun on Form 5300.35"). The dealer then transmits the form to the CLEO of the transferee's place of residence. § 922(s)(1)(A)(i)(III); 27 C.F.R. § 178.102(a)(3).

After a CLEO receives a copy of such a statement from a dealer, that official "shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General." § 922(s)(2). Two additional requirements are imposed on CLEOs in connection with these interim background checks. If the CLEO determines, on the basis of the background check, that a proposed transfer would be lawful, he or she must destroy the transferee's statement and related records. § 922(s)(6)(B)(i). If, however, the CLEO determines that a proposed transfer would be illegal, the CLEO must give written reasons if the would-be gun buyer so requests. *See* § 922(s)(6)(C).

Criminal penalties are provided: "Whoever knowingly violates [the Brady Act interim or permanent provisions] shall be fined . . ., imprisoned for not more than 1 year, or both." 18 U.S.C. § 924(a)(5). The applicability of these penalties to CLEOs is in dis-

pute in this litigation. However, the record does not suggest that Sheriff Frank or any other potential CLEO has been prosecuted or threatened with prosecution under this subsection. In a March 16, 1994 memorandum to the Attorney General, the Office of Legal Counsel took the position that for a variety of reasons prosecuting and applying the penalty provision to CLEOs would be impractical and inconsistent with the statute's language and aim.

## B. *Brady's Implementation in Orange County*

The Bureau, which by delegation of the Secretary of the Treasury is responsible for the implementation of the Gun Control Act and the 1993 amendments, see 18 U.S.C. § 926 (1994), interprets the term "CLEO" as broad enough to encompass more than one law enforcement officer within any given geographical area. On January 21, 1994, before the effective date of the Brady Act, it sent an "Open Letter to State and Local Law Enforcement Officials" (Open Letter) explaining the requirements of the Act and suggesting that state and local officials in each locality work together to decide which agency would perform the CLEO functions. The Bureau now maintains a list of the responsible CLEOs in the jurisdictions within States covered by the five-day interim requirement of the Act and publishes changes in CLEO status in the Federal Register. *See, e.g.,* 59 Fed.Reg. 37,532 (1994).

On January 1, 1994 Sheriff Frank, Commissioner A. James Walton, Jr. of the Vermont Department of Public Safety, and numerous other interested law enforcement officials attended a meeting at Norwich University in Northfield, Vermont organized by the Bureau and the Vermont Department of Public Safety to discuss the Act's implementation. At the meeting, Commissioner Walton told local officials that the State would be willing to appoint an officer of the State Police to discharge the CLEO duties in any jurisdictions in which local officials declined to do so. Sheriff Frank then indicated that he would perform that function in Orange County.

The Bureau subsequently placed the sheriff on its list as the CLEO for Orange County and notified licensed firearms dealers in Vermont of its action. Initially, the sheriff's office performed the background check duties. After Sheriff Frank instituted the present suit, the state safety commissioner asked the Bureau to change the CLEO designation; the Bureau notified the sheriff on June 29, 1994 that it would now treat Lieutenant George C. Contois of the Vermont State Police as the CLEO for Orange County because the sheriff's position in the litigation indicated his unwillingness to perform that function.

## C. *The Lawsuit*

On May 10, 1994 Sheriff Frank commenced the instant action in the District of Vermont against the United States. The complaint sought a declaration that the background check requirement is unconstitutional and requested a preliminary and permanent injunction against its enforcement. The papers filed alleged that the mandated background check violates the Tenth Amendment by impairing the performance of the sheriff's duties under state law, that it violates the Fifth Amendment because it is excessively vague, and that this provision is not severable and the entire interim portion of the Brady Act is therefore invalid. In response, the government contended plaintiff lacked standing to litigate either of his claims because he voluntarily assumed the CLEO duties and because the government's interpretation of the Act's criminal provisions as inapplicable to CLEOs eliminated any threat of prosecution. The government also urged that the background check requirement was a valid exercise of Congress' power and that it was, in any event, severable from the other interim provisions.

Following a hearing, the district court ruled that Sheriff Frank has standing to assert the Tenth Amendment because officers of the Vermont State Police are not CLEOs under 18 U.S.C. § 922(s)(8). *See Frank v. United States,* 860 F.Supp. 1030, 1037–39 (D.Vt.1994). It ruled further that the background check provision is barred by the Tenth Amendment, but that the provision

is severable from the remainder of the Brady Act. *Id.* at 1043–44. The trial court held, in addition, that Sheriff Frank lacks standing to challenge the Act on due process grounds. *Id.* at 1036. From this judgment the United States appeals, and Sheriff Frank cross-appeals.

## ANALYSIS

### I Standing

█ We must first decide whether Sheriff Frank has standing to challenge the Brady Act on Tenth Amendment grounds. Article III of the Constitution imposes three requirements for standing: plaintiff must have suffered an injury in fact, concrete and particularized as to plaintiff, actual and not hypothetical; the injury must be fairly traceable to defendant's challenged conduct and not caused by the independent action of a third party; and the injury must likely, not possibly, be redressable by a favorable decision in the litigation. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984); *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 58 (2d Cir.1994). These constitutional requirements stem from separation of powers principles. *See Defenders of Wildlife,* 504 U.S. at 559–60, 112 S.Ct. at 2135–36. Standing also includes prudential limits, *see, e.g., Golden Hill,* 39 F.3d at 58, which not being here implicated are not addressed.

### A. *Statutory Argument*

█ The issue of standing in the case at hand is, in the first instance, one of statutory construction. The question is whether the term "chief law enforcement officer" used in § 922(s)(2) of the Act includes state as·well as local officers. If so, the government points out, Sheriff Frank's assumption of the CLEO duties in Orange County was voluntary because the Vermont State Police had said it would discharge the duties in any jurisdictions in which local law enforcement agencies did not want to act. If the government is correct and Sheriff Frank's injury is self-inflicted, he lacks standing for Article III purposes. *See Diamond v. Charles,* 476 U.S.

54, 70, 106 S.Ct. 1697, 1707–08, 90 L.Ed.2d 48 (1986) (assessment for attorney's fees resulted from litigant's intervention and could not fairly be traced to statute whose constitutionality was at issue); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976) (injury at the hands of a non-party is insufficient); *Petro–Chem Processing, Inc. v. EPA,* 866 F.2d 433, 438 (D.C.Cir.) (potential liability incurred voluntarily cannot fairly be traced to challenged conduct of defendant), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989).

Plaintiff insists the Act does not permit state officials to be CLEOs. Had Congress meant CLEO to include only local law enforcement officials, then the state safety commissioner's offer to perform the background checks would have had no effect on Sheriff Frank's duties as the CLEO of Orange County and plaintiff's statutory argument would carry the day. We are unable to adopt plaintiff's restrictive understanding of CLEO.

█ To begin, by defining CLEO as "the chief of police, the sheriff, or an equivalent officer or the designee of any such individual," 18 U.S.C. § 922(s)(8), Congress did not expressly exclude state officials from performing background checks. Although, as plaintiff points out, Congress knew how to say "State" when it wanted to, *see, e.g.,* § 922(t)(6) (limiting liability for employees "of the Federal Government or of any State or local government"), it also knew how to say "local" when that is what it meant, *see id.,* and it said neither in the definition of CLEO. Instead, it used the more adjustable term "equivalent officer."

Further, the structure of the Brady Act does not support an interpretation of CLEO restricted to local officers. A broader construction of the term is consistent with the flexible background check responsibility: CLEOs are required only to "make a reasonable effort to ascertain" the legality of a proposed transfer. § 922(s)(2). To make the waiting period and background check effective as an interim measure, the words "or equivalent officer" were used by Con-

gress to reflect the reality that background checks can be performed best in different locales by different agencies. The legislature explicitly recognized the vast differences between different local areas by exempting altogether certain sparsely-populated areas from the requirement, *see* § 922(s)(1)(F); it also accomplished this by using the inclusive term "equivalent officer" within the definition of CLEO. Hence, the Vermont State Police, whose powers over criminal matters are identical to sheriffs' under Vermont law, *see* Vt.Stat.Ann. tit. 20, § 1914 (1987), fall within the definition of CLEO.

Moreover, to the extent the statute is ambiguous, we defer to the Bureau's reasonable interpretation of the term because it is the agency charged with administering the Gun Control Act and the Brady Act. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1983) (where statute silent or ambiguous, the question is whether the agency's resolution "is based on permissible construction of the statute"). Plaintiff asserts that deference is not warranted because "equivalent officer" was not included in the definition of CLEO to resolve conflicting policies. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782–83. Although policy questions are quite clearly implicated, we believe the essential question is not whether there are conflicting policies, but "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781.

It has not so spoken. Neither the Act's text nor its legislative history contains a definition of "equivalent officer," and the Bureau's Open Letter and its compilation of the CLEOs in various jurisdictions, *see, e.g.,* 59 Fed.Reg. 37,532 (1994), make plain that it views CLEO as including state officials. Given the language and purpose of the Act, the Bureau's construction is certainly a permissible one. Consequently, plaintiff's standing may not rest on the scope of the term CLEO.

### B. *Administrative Burdens*

▪ Reading CLEO to include state officials along with local officers does not end the standing inquiry. Although the Act does not require plaintiff to serve as the CLEO of Orange County, we think it inflicts sufficient injury to give him standing. Because the Act envisions that more than one official can qualify as CLEO in a given jurisdiction and provides no formal mechanism for choosing among the candidates, it therefore mandates at a minimum that the relevant state and local law enforcement officials reach an agreement as to which agency will serve as CLEO. *See Roy v. Kentucky State Police,* 881 F.Supp. 290, 293 (W.D.Ky.1995) ("Congress envisioned that law enforcement agencies with an interest in and the ability to perform the Brady Act requirements would meet and agree upon the CLEO in each geographic area."). Indeed, the Bureau's Open Letter so concluded. It suggested that state and local officials work together to determine which agency would perform the CLEO functions in each jurisdiction, which is why the Bureau brought state and local law enforcement officials together not only in Vermont, but throughout the country.

▪ It is this administrative burden added to the sheriff's regular workload that permits plaintiff to maintain his Tenth Amendment challenge. Interference with the functions of a local unit of government is an injury that may give a litigant standing. *Friends of the Earth v. Carey,* 552 F.2d 25, 33 (2d Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). It is familiar law that injury in the context of standing is not limited to economic harm, *see United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973), although a plaintiff seeking review must be among the injured. *See Sierra Club v. Morton,* 405 U.S. 727, 734–40, 92 S.Ct. 1361, 1365–69, 31 L.Ed.2d 636 (1972) (not enough to allege government changes in national park would destroy scenery and wildlife; to have standing plaintiff must allege that its members use the park and are directly affected).

By making Sheriff Frank responsible— even though only concurrently with others— for ensuring that some qualified agency performs the background checks in Orange County, the Act imposes administrative burdens beyond simply reaching an agreement.

To decide which of the potential CLEOs will perform the tasks required by the Brady Act, plaintiff and his counterparts must as a practical matter undertake an analysis of their own internal procedures and capabilities, consider the impact of background checks on their budgets and on delivery of customary sheriff's services, and work together to determine who may best conduct the interim background checks. This imposition compels action by state and local officials in a way that is alleged to violate state sovereignty.

Additionally, the burden does not end with an initial agreement on performing the checks. Plaintiff is excused from the CLEO duties only for so long as the State Police are willing to discharge them. And that willingness, for budgetary, political, and logistical reasons, is always subject to change. The CLEO duties therefore remain a factor in the way the sheriff's office structures its operations. These several burdens, we believe, impact sufficiently upon Sheriff Frank to give him standing to maintain the present action.

Our concurring colleague writes that the imposition of the CLEO duties on Sheriff Frank is sheer speculation and that the administrative burdens are insufficient to support standing. First, although the possibility that the state will withdraw its pledge to supply personnel is not certain to occur, that possibility imposes a present burden on the sheriff that is by no means speculative. The sheriff's office must plan for the contingency even if it never materializes. Moreover, the Act imposes another present burden on him even if the state continues to volunteer: he must reach an initial agreement and continue to agree with the state and other potential CLEOs.

■ Second, although the administrative burdens may appear to be a slender reed upon which to base standing, they are sufficient for constitutional purposes. The burden of an allegedly unconstitutional statute need not be crippling before it may be challenged in court; plaintiff only need allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). While the harm must be "perceptible," *Defenders of Wildlife*, 504 U.S. at 566, 112 S.Ct. at 2139, it need not be monumental. In the present case, the continuing burden on Sheriff Frank meets this requirement and has led to this sharply contested lawsuit. Therefore, the injury-in-fact requirement has been met.

■ The government's argument that Sheriff Frank lacks standing because he voluntarily assumed the CLEO duties is based on the willingness of another state-created entity, with the approval of the Bureau, to perform the functions in his stead. We do not adopt this reasoning because to do so would grant to the government the power unilaterally to prevent the resolution of a controversy by designating and replacing CLEOs and thereby destroying standing. Ten days after the instant action was commenced, Commissioner Walton notified Sheriff Frank that the lawsuit indicated his desire to discontinue the CLEO functions and that the Bureau was being asked to designate the State Police as CLEO. The Bureau assented to the change. A State may not consent to a Tenth Amendment violation, *New York v. United States*, 505 U.S. 144, 182, 112 S.Ct. 2408, 2431, 120 L.Ed.2d 120 (1992); nor should litigants be allowed to strategically prevent controversies from being resolved, *cf. City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982) (a case is not moot where a litigant abandons a challenged practice); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case"). Under the present circumstances, to accept the contention that the sheriff now lacks standing would not serve the purpose of identifying and resolving those disputes most appropriately heard and decided by the federal courts, *see Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. at 2136; *Whitmore v.*

*Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990).

■ Moreover, we have held that a local unit of government has standing to challenge a federal requirement on Tenth Amendment grounds despite the failure of the State—the creator of the local entity—to join in the challenge. *Friends of the Earth,* 552 F.2d at 33. The instant case raises the same concerns—the county sheriff should not be precluded from challenging the statute merely because the State has supported the Brady Act and has pledged personnel to carry out the background checks. The burden imposed on Sheriff Frank by the Brady Act is sufficiently concrete, actual, and particularized to constitute injury for constitutional purposes. The injury is directly caused by the challenged statutory provision, and would be eliminated were the litigation resolved in Sheriff Frank's favor.

As our concurring colleague points out, the burden imposed on New York City in *Friends of the Earth* was much heavier than the one imposed on Sheriff Frank. Although the burden of complying with an automobile pollution control plan is concededly more severe than the administrative requirements mandated by the Brady Act, *Friends of the Earth,* like the present case, involved a Tenth Amendment challenge of a federal requirement by a local governmental unit; the State in *Friends of the Earth* supported the federal mandate and it was argued that the local government therefore had no standing. Here, the State of Vermont has supported the Brady Act and has agreed to perform the interim background checks in certain jurisdictions. Therefore, the principle that was dispositive in *Friends of the Earth*—that a state's failure to oppose a federal requirement does not prevent a political subdivision from bringing a federalism challenge—applies with equal force to the present case. Plaintiff therefore has standing to challenge the Act on Tenth Amendment grounds.

## II Tenth Amendment

### A. Federalism Principles and the Boundaries of Congressional Power

■ Having resolved the threshold question of standing, we pass now to a discussion of the merits. The Tenth Amendment to the United States Constitution states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Because the Tenth Amendment simply states that all is kept that has not been surrendered, *see United States v. Darby,* 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941), the reach of the federal government's power vis-á-vis the States may be analyzed as a question of whether Congress has exceeded the bounds of its delegated powers, or whether it has impermissibly trenched upon state sovereignty. As observed by the Framers, that power surrendered by the people is divided between two governments that will control each other, giving rise to a "double security" protecting the rights of the people. *The Federalist* No. 51, at 263–64 (James Madison) (J.M. Dent & Sons Ltd., 1961). The purpose of the division is to protect the liberty of individual citizens from an excessive concentration of power in a central government. *See United States v. Lopez,* —— U.S. ——, ——, 115 S.Ct. 1624, 1626, 131 L.Ed.2d 626 (1995) (The mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." (internal quotations omitted)); *Gregory v. Ashcroft,* 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) (as the separation of the branches of national government keeps each in check, so a "balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front").

■ To help navigate safely through the murky waters of Tenth Amendment doctrine, it is necessary to dispel the notion that the federal government may *never* compel action by state officials. This was stated to be the law over a century ago in *Kentucky v. Dennison,* 65 U.S. (24 How.) 66, 107, 16 L.Ed. 717 (1861): "[T]he Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it." Today, a view that the national and state governments are coequal sovereigns in all circumstances

does not fairly represent the state of the law. *See Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 761, 102 S.Ct. 2126, 2138, 72 L.Ed.2d 532 (1982) *(FERC).*

■■■ There are occasions when the federal government may impose legal duties on state officers. For example, Congress may require state regulatory authorities to implement federally-promulgated rules requiring the adjudication of disputes arising under a federal statute. *See FERC,* 456 U.S. at 759–60, 102 S.Ct. at 2137–38. Instead of preempting an area of state regulatory activity, Congress may require state authorities to consider the enactment of federally-proposed standards, *id.* at 764, 102 S.Ct. at 2140. Also, the national government may insist that States treat their workers according to federally-imposed wage and overtime standards. *See Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 555–56, 105 S.Ct. 1005, 1019–20, 83 L.Ed.2d 1016 (1985) (upholding minimum wage and overtime requirements); *Fry v. United States,* 421 U.S. 542, 548, 95 S.Ct. 1792, 1796, 44 L.Ed.2d 363 (1975) (upholding wage stabilization measures).

■■■ Certain kinds of federal action are by their very nature so intrusive as to violate the Tenth Amendment regardless of how light a burden is imposed on state officials. Coercive commandeering of the States' legislative processes that effectively compels the States to adopt a federal regulatory program is one example. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981). In *New York v. United States,* 505 U.S. 144, 177, 112 S.Ct. 2408, 2429, 120 L.Ed.2d 120 (1992), the Supreme Court held that the take title provision in the Low–Level Radioactive Waste Policy Amendments Act of 1985, which gave States the choice between either taking title to and assuming legal responsibility for waste generated within their borders, or regulating such waste according to Congress' instructions, exceeded Congress' power under the Constitution. It was the coercive nature of the take title provision that violated the constitutional plan, that is, Congress has no power to make the States require or prohibit certain acts, even though Congress itself may

pass laws requiring or prohibiting those same acts. *Id.* at 166, 112 S.Ct. at 2423. The take title provision also violated the principle that officials, both state and federal, must remain accountable to their constituents. *Id.* at 168, 112 S.Ct. at 2424.

■■■ Therefore, there is a clear prohibition against directing States to legislate or to regulate because the structural nature of the intrusion plainly strikes at the heart of state sovereignty and violates the Constitution's careful allocation of power between the federal and state governments. Apart from this specific prohibition, the severity of the burden placed on States is the touchstone for determining whether national legislation is so onerous as to threaten the effectiveness of the States in our federal system. In the case of a law of general application, for instance, state sovereignty will ordinarily be sufficiently protected by the States' participation and influence in the national political process, *see Garcia,* 469 U.S. at 554, 105 S.Ct. at 1019, so as not to warrant judicial intervention to safeguard their interests. Directives aimed solely at States have similarly been upheld if they do not place "any particularly onerous burden on the State." *FERC,* 456 U.S. at 768, 102 S.Ct. at 2142.

■■■ In determining whether Congress has transgressed either the structural or the quantitative limits, the nature of the federal requirement imposed on the States rather than the subject matter of the regulation must be examined. Rejecting, as impracticable, the four-part test for immunity from federal regulation set forth in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court in *Garcia,* 469 U.S. at 548, 105 S.Ct. at 1016, focused on preserving the *role* of the States in our federal system. Thus, *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), upheld a federal statute that effectively required States to issue registered bonds, as opposed to bearer bonds, if they chose to issue bonds at all. *South Carolina* confirmed that the limits imposed by the Tenth Amendment are "structural, not substantive." That is, States must find protection from Congress' intru-

sions via the national political process, not by having courts define state activities that may not be regulated. *Id.* at 512, 108 S.Ct. at 1360–61. *New York* reaffirmed that Tenth Amendment analysis should focus on the appropriate roles of the States and the federal government rather than the subject matter of the regulation. *See* 505 U.S. at 160–61, 112 S.Ct. at 2419–21.

### B. *Constitutionality of the Brady Act*

With these principles in mind, we now address the constitutionality of the provision requiring CLEOs to "make a reasonable effort to ascertain ... whether receipt or possession [of a handgun] would be in violation of the law." *See* 18 U.S.C. § 922(s)(2). We do not think the background check requirement of the Brady Act interim provisions imposes a structural burden inconsistent with the plan established by the Constitution; nor does it impose an onerous quantitative burden on state or local officials. We address these issues in turn.

### 1. *Brady Act Consistent with Structural Limits of Tenth Amendment*

We turn first to the formal limits imposed by the federal structure of our Constitution. Sheriff Frank, relying primarily on *New York*, urges that the interim background check requirement is unconstitutional regardless of the quantitative degree of the burden imposed. The Tenth Amendment does impose structural restrictions on congressional action. But unlike the statute at issue in *New York*, which attempted to foist the responsibility for addressing the problems of low-level radioactive waste upon the States, the Brady Act is consistent with the constitutional scheme.

As already noted, we rejected at the outset plaintiff's contention that Congress may never compel state officials to perform duties and may only seek to guide States' behavior by attaching conditions to federal funds, threatening preemption, or passing generally-applicable legislation. *New York* did not purport to revert to the 19th-century rule that the federal government may never impose obligations on state officers. Instead, that case involved a "unique" statute that in its take title provision coerced state governments into implementing federal law and therefore violated the Tenth Amendment. 505 U.S. at 177, 112 S.Ct. at 2429. The Supreme Court reasoned that the take title provision and its alternative pressed state governments into federal regulatory service by offering States the choice between regulating according to Congress' instructions or themselves assuming liability for the waste. *Id.* at 175, 112 S.Ct. at 2427–28. The offending take title provision violated *Hodel*'s edict that the national government cannot mobilize "the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." 452 U.S. at 288, 101 S.Ct. at 2366.

The Brady Act does not direct the States to enact legislation or to promulgate regulations. *See Mack v. United States*, 66 F.3d 1025, 1031 (9th Cir.1995). Rather, to the extent that it implicates the States' legislative processes at all, it merely allows States to enact a background check or permit system for handgun purchases as an alternative to federally-required checks by CLEOs, *see* 18 U.S.C. § 922(s)(1)(C)–(D). But, such a state enactment is not mandated or even significantly encouraged.

Sheriff Frank, further relying on *New York*, urges that the Brady Act contravenes the Tenth Amendment because Congress has "the power to regulate individuals, not States," *New York*, 505 U.S. at 166, 112 S.Ct. at 2423, and that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program," *id.* at 188, 112 S.Ct. at 2435. The background check requirement of the Act does not transgress *New York*'s holding. Unlike the statutory scheme established in the Low–Level Radioactive Waste Policy Amendments Act of 1985, designed to encourage States to reach their own solutions, the Brady Act is an exercise of Congress's power to regulate individuals. The thrust of the Act is to improve the effectiveness of the laws governing handgun transfers between individual citizens. To achieve this purpose, the Act requires registered dealers and potential transferees to supply information to law enforcement personnel when a transaction is

proposed, and it prohibits the consummation of potential transactions found to be illegal. That the Brady Act enlists state officials during the interim period, pending the implementation of a national system for instant background checks, does not change the Act's basic character. Because the Act neither requires States to enact regulations by requiring them to fashion their own solutions, nor abdicates political responsibility in the handgun control field, it is distinguishable from the statutory provision found offensive in *New York.*

■ Congress has authority to subject state governments to generally applicable laws that govern the conduct of private parties. Such laws are different from attempts by the national government to direct or otherwise motivate the States to regulate in a particular field in a particular way, that is to say, it is permissible for Congress to require private citizens to act in a certain manner and for the States to help administer such a federal law, but Congress cannot require the States to pass laws requiring their citizens to act in a certain manner.

Congress is, according to *New York,* barred under the Tenth Amendment from compelling state legislatures to enact legislation because the federal government may not commandeer the basic decisionmaking processes of state government. This view is reinforced by the Supreme Court's repeated reference to *Hodel,* which upheld provisions of the Surface Mining Control and Reclamation Act of 1977 because that statute did not compel the States to enact and enforce a federal regulatory program and thereby take over the States' legislative processes. *Hodel,* 452 U.S. at 288, 101 S.Ct. at 2366, *quoted in New York,* 505 U.S. at 161, 162, 170, 176, 112 S.Ct. at 2420–21, 2421, 2425, 2428–29. The offending provision in *New York*—because it required States to enact their own regulatory solution—was the sort of unconstitutional legislation alluded to in *Hodel.*

Moreover, the Framers contemplated and approved the administration by state officials of federal laws applicable to individuals. Thus, Madison said collection of tax revenue for national purposes "will generally be made by the officers ... appointed by the several States." *The Federalist* No. 45, at 237 (James Madison) (J.M. Dent & Sons Ltd., 1961). Hamilton agreed: "The national legislature can make use of the *system of each State within that State.* The method of laying and collecting ... taxes in each State can, in all its parts, be adopted and employed by the federal government." *The Federalist* No. 36, at 172 (Alexander Hamilton) (emphasis in original). Mandates to local officials to enforce federal as well as state laws—as in the interim provisions of the Brady Act—do not encroach on state sovereignty in any appreciable manner.

The absence of compelled regulation helps illuminate the central reason that *New York* is not controlling: the roles of the federal government and the States under the Brady Act are consistent with the values underlying federalism. "[W]here the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished." *New York,* 505 U.S. at 168, 112 S.Ct. at 2424. Under an arrangement like that in *New York,* "it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decisions." *Id.* at 169, 112 S.Ct. at 2424.

The Brady Act has no such effect on accountability. First, the Act itself is a national, comprehensive approach to identifying potential illicit handgun transactions. Because it requires no additional enactments by state governments, it poses little risk of shifting the blame (or glory) for its provisions to local officials. Additionally, because the administration of the interim provisions is vested in a federal agency—the Bureau of Alcohol, Tobacco and Firearms—there is little danger of confusion. For example, the Act instructs potential transferees to fill out a Form 5300.35, clearly identified as a federal form. *See* 27 C.F.R. § 178.102(a)(1) (1995).

Second, political accountability would be jeopardized were local officials able to invoke the Tenth Amendment to defeat even the lightest and most insignificant federal mandate. Just as Congress in *New York* attempted to shift responsibility to state offi-

cials, federal officials could shift the blame for *inaction* by attributing persistent national problems, such as handgun violence, to the intransigence of local officials. Even more problematic is the possibility that federal officials could consistently surrender responsibility for national problems by invoking abstract notions of "federalism," which would result in dissipation, as opposed to a mere shifting, of political responsibility. Thus, the accountability concerns discussed in *New York* support the validity of the Brady Act.

Today's ruling serves the purposes of federalism in another way. Returning to the 19th-century prohibition of any direct mandate to state officers would lead Congress, when it acts, to do so exclusively through federal instrumentalities. Rather than promoting the "constitutionally mandated division of authority" intended by the framers to protect individual citizens' liberties, *Lopez,* — U.S. at ——, 115 S.Ct. at 1626, the perverse result would be a further concentration of authority in the federal government. Sheriff Frank has not asserted in this litigation that Congress could not, by exercising its commerce power, bypass local governments and employ federal agents to check on citizens who wish to purchase firearms. Such action illustrates how direct federal intervention could follow from the adoption of a simple "no compulsion" rule. Federalism is too crucial, too central to our system of government to be trivialized by a rule that would make any co-optation of any state official into a violation of the Constitution. The effect of such a rigid rule would be the multiplication of direct federal bureaucratic intervention and, hence, in practice, a greater reduction in effective federalism.

In addition to being qualitatively different from arrangements like the one invalidated in *New York,* the duties imposed on CLEOs are more like those that have been upheld in prior cases. Congress can require state courts to entertain a federal claim despite a contrary state rule or policy. *See Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Although a state court may refuse to do so if it has a "valid excuse," *see Douglas v. New York, New Haven & Hartford R.R. Co.,* 279 U.S. 377, 388, 49 S.Ct.

355, 356, 73 L.Ed. 747 (1929), "[a]n excuse that is inconsistent with or violates federal law is not a valid excuse." *Howlett v. Rose,* 496 U.S. 356, 371, 110 S.Ct. 2430, 2440, 110 L.Ed.2d 332 (1990). This principle does not apply only to state courts; Congress also may enlist state regulators to vindicate federal rights. *See FERC,* 456 U.S. at 760 & 763 n. 27, 102 S.Ct. at 2137–38 & 2139 n. 27 ("[I]t is difficult to perceive any fundamental distinction between the state legislature's power to establish limits on the jurisdiction of the state courts, and its prerogative to set ratemaking criteria for use by quasi-legislative utilities commissions.").

CLEOs' duties under the Brady Act are not qualitatively different from the congressionally-imposed functions upheld in such cases as *Testa* and *FERC.* When a Form 5300.35 is forwarded by a transferor, a CLEO is required to consult relevant records and issue a determination as to whether the transaction can be consummated. If the decision is favorable, the five-day waiting period is truncated and the weapon may be transferred. *See* 18 U.S.C. § 922(s)(1)(A)(ii)(II). The same result obtains if the five-day period has elapsed without notice from the CLEO. *See* § 922(s)(1)(A)(ii)(I). If the decision is not favorable, then the transaction has been identified as illegal and may not take place. *See* § 922(s)(1). In the operation of the Brady Act, as in the circumstances of *FERC* and *Testa,* the federal government has taken responsibility for determining the applicable standards, and state officials are being asked to apply those standards to a particular situation. Although plaintiff attempts to dismiss *FERC* and *Testa* as merely addressing "adjudicatory" bodies, in so doing he fails to acknowledge the striking similarity between the obligations imposed in those cases and those imposed on CLEOs. The applicability of the *Testa* principle depends upon the role performed by the state officer, not the governmental branch involved. *See FERC,* 456 U.S. at 762 n. 27, 102 S.Ct. at 2139 n. 27. Thus, the proffered distinction is irrelevant. *Testa* was distinguished in *New York* on the grounds that the legislation in question in the latter case did not regulate individuals and required States to engage in legislation. *Id.*

at 178–79, 112 S.Ct. at 2429–30. Unlike a statute that commands state legislatures to legislate, the Brady Act simply requires CLEOs to apply federal law in the regulation of individuals and to perform a function similar to those validated in *FERC* and *Testa.*

In sum, after *Testa, Garcia, Gregory,* and *New York* it is now clear that Congress acts within its broad power to regulate under the Commerce Clause when its legislation neither obscures lines of political accountability nor disturbs the ordinary presumed sovereignty of the States. This principle furthers federalism and strengthens its attendant political safeguards—the "double security"—in our constitutional system.

### 2. *No Impermissibly Onerous Burden on States*

Sheriff Frank contends, at least with respect to his standing argument, that the duties imposed by the Brady Act are burdensome. In an affidavit filed in support of a preliminary injunction, he stated a typical background check included a search of the National Crime Information Center that the State Police in Bradford, Vermont performed at his request. The National Crime Information Center provides criminal background information that covers the entire country. Preparing the request and transmitting it by facsimile took 15 minutes. The State Police would notify the Sheriff's office by telephone of potential legal problems with a given transfer. To obtain the National Crime Information Center's findings, he reported, a deputy had to drive 30 minutes to the State Police barracks and back. Deciphering the report often demanded additional telephone calls. In his affidavit, Sheriff Frank described a number of other sets of records that might be relevant to the legality of handgun transactions. When he testified before the district court, he indicated that a Brady check "may take us anywhere from 15 minutes to—well, we had one up to six hours."

We do not think the described burden is so significant quantitatively that it rises to the level of a constitutional violation. Courts should avoid construing a statute in a manner that raises serious constitutional

problems whenever possible, unless such otherwise acceptable construction of a statute is not plainly repugnant to Congress' aim. This is true generally, *see, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988), and is particularly true where a federal statute might be construed to invade state sovereignty impermissibly, *see Gregory v. Ashcroft,* 501 U.S. 452, 469–70, 111 S.Ct. 2395, 2405–06, 115 L.Ed.2d 410 (1991); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989). In the context of the Brady Act, this rule tips us toward construing the background check requirement as imposing only a light burden on CLEOs. Such a reading is consistent with the tenor and language of the Act, which simply requires a "reasonable effort" and directs that the background check include searching state and local records only if they are "available." *See* 18 U.S.C. § 922(s)(2). The view that the burden is a light one accords with the Bureau's interpretation of the Act as expressed in its Open Letter, which stated the Act requires "some minimal effort to check commonly available records."

Because the relevant circumstances—including the availability of resources, access to records, frequency of requests, and the likelihood that the CLEO will be personally acquainted with the transferee—will vary among different localities, what is a "reasonable effort" depends upon the jurisdiction. In some extreme situations, such as where an emergency demands the immediate attention of the CLEO, a "reasonable effort" might conceivably be no action at all. The Brady Act's use of a highly subjective standard ensures that state officials are not excessively burdened. Moreover, the degree of inconvenience visited on the States is even smaller in view of the flexible definition of CLEO, discussed above, which allows agencies like Sheriff Frank's office to avoid the task by delegation or by agreement with other agencies qualifying as CLEOs.

In view of our duty to construe statutes so as to avoid raising serious constitutional problems, and the text and legislative history

of the Act, we interpret the Act as imposing a minimal, as opposed to an onerous, burden on CLEOs. If a CLEO engages in unreasonably burdensome activities to determine the legality of proposed handgun transfers, the CLEO cannot claim that the statute demands it. Congress has tailored the Brady Act to require only a minimal effort, one no more oppressive than the requirements upheld in *FERC*. Such effort does not constitute a hardship of constitutional proportions.

Similarly, the two other relevant requirements of the Brady Act—destruction of records and notification of certain transferees of the reasons for denying their applications—also do not constitute impermissibly burdensome directives. These requirements are dwarfed by the administrative hearings and judicial actions mandated by PURPA. From the standpoint of the required time, the effect on resource allocation, and the level of difficulty, these duties are relatively insignificant. Indeed, Sheriff Frank has not represented to us that these post-search responsibilities are onerous. Other courts have concluded they are not. *See Printz v. United States,* 854 F.Supp. 1503, 1517 (D.Mont.1994) (record destruction requirement is *de minimis*), *rev'd on other grounds sub nom. Mack,* 66 F.3d at 1034; *McGee v. United States,* 863 F.Supp. 321, 327 (S.D.Miss.1994) (same).

In addition, the very circumstances that cast doubt on whether Sheriff Frank had standing—the willingness of other state officials to perform the CLEO functions—tend to show that the Brady Act is not a significant imposition on state or local officers. If the tasks required by the Act were impracticable or unduly onerous, the State Police might not have been so willing to relieve local law enforcement officials of the obligation. Nor might Sheriff Frank have been so willing to volunteer initially to perform the CLEO duties. Usually, of course, the issue of standing is entirely separate from the question of the merits. But in this case, the same facts that lead the concurring judge to find no standing seem to us—while indicating the presence of some burden—to show the burden imposed on Sheriff Frank and others in his position to be sufficiently small that our conclusion on the merits follows almost necessarily.

In sum, the obligations imposed on CLEOs by the Brady Act do not entrench on those powers reserved to the States by the Tenth Amendment. The Brady Act does not establish a structurally defective scheme like the one struck down in *New York.* The effort required is minimal, and the Act is therefore not unconstitutional by virtue of the magnitude of the burden. Finally, it is consistent with the principles undergirding our federal system, and with past decisions permitting federal impositions on States. As a consequence, we declare the challenged provisions of the Brady Act constitutional.

### III Due Process

We turn now to the remaining issues and dispose of them as briefly as possible. Plaintiff urged the district court, in support of his motion for a preliminary injunction, to rule that the Act's background check requirement is unconstitutionally vague. This argument depended on the applicability of the Brady Act's criminal penalty provision to CLEOs. *See Frank,* 860 F.Supp. at 1034. The district court held instead that Sheriff Frank lacked standing with respect to this Fifth Amendment claim because the Department of Justice's Office of Legal Counsel stated that the penalty provisions do not apply to CLEOs. The trial court ruled that Sheriff Frank was in no danger of being prosecuted and had therefore failed to demonstrate an injury. *See id.* at 1036.

On appeal, plaintiff again challenges § 922(s)(2) as unconstitutionally vague. He does this by identifying vagueness as an issue and incorporating arguments made in a memorandum in support of his motion for a preliminary injunction. No other reference to this issue or the Brady Act's criminal penalty provision is found in plaintiff's main brief, though he tersely contends in his reply brief that the "reasonable effort" requirement of § 922(s)(2) is vague because it requires subjective interpretation by CLEOs.

### A. *Justiciability*

The Fifth Amendment question does not present a justiciable controversy. Our analy-

sis is substantially similar to that of the district court. Ripeness, standing, and related doctrines "relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1179 (D.C.Cir.1983) (Bork, J., concurring), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983)).

 Our sensitivity to these concerns is particularly acute when a litigant invokes the power of judicial review, a power at once justified and limited by our obligation to decide cases. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 87, 111–12, 2 L.Ed. 60 (1803). As a result, a litigant challenging the constitutionality of a statute must be subject to a "credible threat of prosecution," although actual charges need not have been filed. *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979). Further, in analyzing ripeness, we must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

 It is inappropriate for us to address cross-appellant's vagueness claim, first, because there is no "credible threat" of criminal charges. The government, earlier in the litigation, relied on an Office of Legal Counsel memorandum concluding that CLEOs are not subject to criminal liability under the Brady Act as evidence of a formal position on the matter. Plaintiff asserts that since the memorandum was not issued by the Attorney General or formally published, it therefore represents but an informal opinion.

Even assuming that, there still remains no substantial threat of prosecution. The record does not reflect that any CLEO has been prosecuted or threatened with prosecution under the Brady Act. In addition, the Office of Legal Counsel's memorandum, however informal, has been proffered on numerous occasions as the government's position, suggesting that criminal charges against CLEOs are exceedingly unlikely. That memorandum cites a variety of compelling reasons that such prosecutions would be futile, further supporting the proposition that charges are not imminent. In light of this, plaintiff cannot be said to have a "realistic fear of prosecution." *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961). Plaintiff's failure to preserve the issue for appellate review, explained below, lends support to this conclusion.

Sheriff Frank also declared, in his reply brief, that further delay would serve no purpose because the vagueness issue is primarily one of law, and that the question should be settled for the sake of the many officials who may qualify as CLEOs. We disagree. Although additional facts may not be necessary, plaintiff's failure to advance a substantive legal argument leads us to believe the issue unfit for decision now. *See Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515–16. Finally, declining to reach the issue does not work a hardship on either party to this suit. The vagueness question is therefore not justiciable.

## B. *Failure to Raise the Question on Appeal*

 Apart from ripeness concerns, we would not decide the vagueness issue because it was not adequately raised by plaintiff. Rule 28(a) of the Federal Rules of Appellate Procedure requires that appellants' briefs include seven specific items: (1) tables of contents and authorities, (2) statement of jurisdiction, (3) statement of issues, (4) statement of the case, (5) summary of argument, (6) argument, and (7) conclusion. The argument section must include "the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." *See* Fed.R.App.P. 28(a)(6). In a case in which a cross-appeal is filed, the appellee's brief must conform to the rules governing appellants' briefs except that a statement of the case is not mandatory. *See* Fed. R.App.P. 28(h). With respect to his Fifth Amendment claim, plaintiff—an appellee and

cross-appellant—did not comply with Rule 28. Although he mentioned the Fifth Amendment claim in the "issues" section and attempted to present it to us by referring to his arguments to the district court, he failed to present an argument or a "conclusion stating the precise relief sought" with respect to it. Fed.R.App.P. 28(a)(6).

■ In *United States v. Restrepo*, 986 F.2d 1462 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 130, 126 L.Ed.2d 94 (1993), appellant's argument that the district court failed to observe the maximum sentence was initially presented only in a footnote, and it was therefore inadequately raised for appellate review. *Id.* at 1463; *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1430 (7th Cir.1986) (same rule). Issues not sufficiently argued are in general deemed waived and will not be considered on appeal. *See United States v. Maniktala*, 934 F.2d 25, 27 (2d Cir.1991); *Travitz v. Northeast Dep't ILG-WU Health & Welfare Fund*, 13 F.3d 704, 711 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2165, 128 L.Ed.2d 888 (1994); *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir.1993).

■ Sheriff Frank concededly did more than the appellant in *Restrepo:* he referred to another document filed in the litigation, stated the issue, and presented a short argument in his reply brief. However, none of these additional factors leads to a different outcome. Merely incorporating an argument made to the district court does not preserve a question for appellate review. *See Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 n. 6 (4th Cir.1994) ("Novatel[ ] use[d] ... a practice that has been consistently and roundly condemned by the Courts of Appeals: the appellant's briefs merely adopted by reference the memoranda that it had previously filed in the district court.") (citing 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3974, at 733 & 742 n. 27.7 (2d ed. Supp. 1994)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1254, 131 L.Ed.2d 135 (1995); *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir.1983). In addition, simply stating an issue does not constitute compliance with Rule 28(a): an appellant or cross-appellant must state the issue *and* advance an argument. *See Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir.), *cert. denied*, 498 U.S. 966, 111 S.Ct. 427, 112 L.Ed.2d 411 (1990); *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 352 (1st Cir.1989), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Further, a cross-appellant generally cannot resurrect an argument omitted in its main brief by raising it for the first time in a reply brief. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993).

■ We recognize that a litigant's failure to comply with Rule 28 does not automatically preclude us from considering an issue. Just as it is within our discretion to decide certain legal questions *sua sponte, e.g., Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir.1993) (failure to state a claim), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994), we may overlook a litigant's failure properly to present an issue on appeal in unusual circumstances, one being where manifest injustice would otherwise result. Fed.R.App.P. 2 ("In the interest of expediting decision, or for other good cause shown, a court of appeals may ... suspend the requirements or provisions of any of these rules in a particular case"); *see, e.g., United States v. Babwah*, 972 F.2d 30, 35 (2d Cir.1992); *United States v. Loya*, 807 F.2d 1483, 1487 (9th Cir.1987); *United States v. Anderson*, 584 F.2d 849, 853 (6th Cir.1978).

■ We decline in the instant case to exercise our discretion and disregard the general rule. Sheriff Frank did not attempt to explain omitting the Fifth Amendment argument from his main brief. Nor did he advance the vagueness contention at oral argument. If, as his reply brief asserts, he is threatened with prosecution under the Act's criminal provisions, it might be expected that he would mention such at oral argument. Indeed, the same factors that lead us to conclude that the Fifth Amendment question would not be justiciable even if it had been raised, as explained above, strongly suggest that plaintiff will not suffer injustice—manifest or otherwise—from our decision not to address the merits of his due process claim.

Moreover, because of the lack of a serious controversy on the Fifth Amendment question, we need not address whether overlooking a violation of Rule 28 would be warranted in other cases involving, for example, "important ... question[s] of first impression concerning statutory interpretation." *United Transp. Union v. Dole*, 797 F.2d 823, 827 (10th Cir.1986). Nor do we address the suggestion in *NLRB v. Semco Printing Ctr., Inc.*, 721 F.2d 886, 893 & n. 4 (2d Cir.1983), that review is permissible in administrative enforcement proceedings when an argument is not advanced or is merely referenced in a footnote. We simply hold that we need not reach the merits in this case, because the cross-appellant has not properly preserved the issue.

## CONCLUSION

Because of our ruling that the Brady Act's imposition on CLEOs is constitutional, we need not decide whether the background check provision is severable from the remainder of the Act. Insofar as the judgment of the district court ruled that Sheriff Frank has standing to challenge the Brady Act on Tenth Amendment grounds, it is affirmed; insofar as it ruled that the interim background check requirement of the Brady Act violates the Tenth Amendment, it is reversed and that portion of the Brady Act is found constitutional; and, finally, insofar as it declined to reach the merits of cross-appellant's Fifth Amendment claim, it is affirmed.

Affirmed, in part, and reversed, in part.

MINER, Circuit Judge, concurring in the result:

I am of the opinion that Sheriff Frank lacked standing to maintain this action and therefore see no need to pass on the constitutional claims that he advances. Accordingly, I agree with my colleagues only to the extent that judgment should be entered for appellant.

There are three requirements that must be met to establish a case or controversy calling for the exercise of federal judicial power under Article III of the Constitution: first, the plaintiff must have suffered an injury in fact—an injury that is actual or imminent, not hypothetical or conjectural, is concrete and is seen to "affect the plaintiff in a personal and individual way," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 & n. 1, 112 S.Ct. 2130, 2136 & n. 1, 119 L.Ed.2d 351 (1992); second, the injury must be fairly traceable to the defendant's challenged action and not caused by the independent action of a third party, *id.* at 560, 112 S.Ct. at 2136; and third, it must be likely, not just possible, that the injury will be redressed by a favorable court ruling, *id.* at 561, 112 S.Ct. at 2136–37.

I cannot perceive how the Brady Act has caused Sheriff Frank to suffer any injury in fact within the meaning of *Lujan*. My colleagues properly decide that a Chief Law Enforcement Officer ("CLEO") can be a state official as well as a local official within the intendment of the Brady Act. The Act does not appear to impose CLEO duties upon anyone unwilling to undertake them. A locality may have any number of officers who fit the definition of CLEO—Chief of Police, Sheriff or State Commissioner of Public Safety. Sheriff Frank voluntarily took on the CLEO function, apparently for the sole purpose of challenging the Brady Act. His instigation of this lawsuit impelled Commissioner Watson of the Vermont Department of Public Safety to conclude that Sheriff Frank really did not desire to perform the duties of a CLEO. Accordingly, the Commissioner requested the Bureau of Alcohol, Tobacco and Firearms to change the CLEO designation in Orange County, where Sheriff Frank holds forth. The Bureau has agreed to treat Lieutenant Contois of the Vermont State Police as the CLEO for Orange County because of the Sheriff's apparent unwillingness to act. What actual injury has the Sheriff suffered? How has he been affected in a personal and individual way?

My colleagues say that "administrative burdens" constitute the concrete injury contemplated by the standing requirement. The administrative burdens, they say, consist of working together with state and local officials to determine which agency would perform the CLEO function. Because Sheriff Frank is responsible for participating in this decision-making process, he must "undertake an

analysis" of his own procedures and capabilities, supposedly an onerous administrative burden. It just does not seem to me that a simple decision to pass up the CLEO job constitutes any sort of a "burden," let alone one that amounts to an injury in fact.

There is yet another "burden," according to my colleagues, that justifies a finding of the requisite actual or imminent injury—that the state police may at some time in the future decide to discontinue CLEO duties in Orange County and Sheriff Frank might then have to assume those duties. Accordingly, it is said, the Sheriff must so structure his operations as to be ready for this eventuality. However, there is no suggestion whatsoever that the state police have any intention of giving up the CLEO function in Orange County. It certainly cannot be said that any such action is "imminent." Also, there is nothing to say that some other law enforcement agency will not take up the duties in the event the state police gives them up. In any event, it is sheer speculation to say that the duties might someday be imposed on Sheriff Frank. The administrative burdens cited constitute a very thin reed upon which to rest a finding of injury sufficient to confer standing.

I very much disagree with the proposition that *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977), supports Sheriff Frank's standing claim. In *Friends*, we were presented with the question of whether the City of New York (the "City") had standing to claim that enforcement of a pollution control plan, promulgated by the State of New York pursuant to the Federal Clean Air Act, represented an invasion of the City's sovereignty in violation of the Tenth Amendment. *Id.* at 33. The pollution control plan at issue in *Friends* was promulgated in accordance with a federal statutory scheme that provided states with the choice of promulgating their own pollution control plans or submitting to a plan promulgated by the Environmental Protection Agency. *Id.* at 30. New York State, with the assistance of the City, promulgated a plan (the "Plan") to meet the federal air quality standards in the City, and the Plan became binding upon and enforceable against both the state and the City.

The City, a defendant in the action that sought to compel it to enforce the Plan, claimed that "a judgment directing it to enforce the Plan would interfere with its governmental interests in allocating funds, police resources and in making policy decisions." *Id.* at 33. We held that "the City's claim satisfies traditional notions of standing since the City is allegedly threatened with injury to its governmental interests and is within the class of entities which the Supreme Court has held to be protected from incursions of federal power." *Id.*

The City in *Friends* suffered a far more concrete and particularized injury than Sheriff Frank presents in the instant case. First of all, while the City in *Friends* was the subject of an action seeking to compel it to enforce the Plan, Sheriff Frank has not been compelled to comply with the requirements of the Brady Act. Indeed, the sheriff volunteered to assume CLEO duties and was relieved of his responsibilities immediately after he objected to performing those responsibilities. Moreover, Sheriff Frank cannot demonstrate that it is even remotely possible that he would be required to perform the CLEO duties in the future. Therefore, his claim of injury is merely "hypothetical" and "conjectural."

In *Friends*, the City sustained a severe invasion of a legally protected interest. The City there was faced with the possibility of being compelled to enforce a plan to meet federal air quality standards for carbon monoxide, hydrocarbons, oxidants, and nitrogen dioxide. Here, Sheriff Frank was required to work with other law enforcement officials to decide who would assume the CLEO duties. This really cannot be compared with the burden of complying with federal air pollution standards in the New York City metropolitan area. Sheriff Frank cannot point to any concrete injury. Accordingly, he has no standing to put forward his constitutional challenges to the Brady Act.